John Meyer
K.E. Purcie Bennett
Cottonwood Environmental Law Center
24 S. Willson Ave Suites 6-7
Bozeman, MT 59715
406-587-5800
406-587-5801 fax
John@Cottonwoodlaw.org
Purcie@Cottonwoodlaw.org

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| FRIENDS OF THE NORBECK; NATIVE ECOSYSTEMS COUNCIL,<br> Plaintiffs,<br><br>v.<br><br>U.S. FOREST SERVICE; RICK CABLES, Regional Forester<br> Defendants | Civil Action No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## I. INTRODUCTION

1.     This is a civil action for judicial review under the Administrative

Procedure Act, 5 U.S.C. §§ 701 *et seq.,* of the United States Forest Service's

Record of Decision (ROD) authorizing implementation of the Norbeck Wildlife

Project (Project).

2.     Plaintiffs Friends of the Norbeck and Native Ecosystems Council

allege this decision is arbitrary and capricious, an abuse of discretion, and/or

otherwise not in compliance with the law.

3.      Defendants' approval of the Project as written is a violation of the Norbeck Organic Act (NOA), 16 U.S.C. §675, National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.*, National Forest Management Act (NFMA), 16 U.S.C. § 1600 *et seq.*, Clean Water Act (CWA), 33 U.S.C. §§ 1251 *et seq.*, and the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

4.      Plaintiffs request that the Court set aside the decision approving the Project, pursuant to 5 U.S.C. § 706(2)(A), and that the Court enjoin the U.S. Forest Service from implementing the Project.

5.      Plaintiffs seek declaratory and injunctive relief to mitigate, redress, or avoid irreparable injury to the environment and its interests under the law, and such other relief as this Court deems just and proper.

6.      If Plaintiffs prevail, Plaintiffs will seek an award of costs of suit, including attorney and expert witness fees.

## II.  JURISDICTION

7.      This action arises under the laws of the United States and involves the United States as a Defendant. This Court has subject matter jurisdiction over the claims specified in this complaint pursuant to 28 U.S.C. §§ 1331, 1346.

8.      An actual, justiciable controversy exists between Plaintiffs and

Defendants.  Plaintiffs' members use and enjoy the Norbeck Wildlife Preserve for hiking, fishing, hunting, camping, photographing scenery and wildlife, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the affected area frequently and on an ongoing basis in the future.

9.      The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs' members have been and will be adversely affected and irreparably injured if defendants are allowed to continue implementing the Project as approved.  These are actual, concrete injuries caused by defendants' failure to comply with mandatory duties under NOA, NFMA, NEPA, CWA and the APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 and 706.

10.      Plaintiffs and their members submitted extensive, written comments concerning the Project and fully participated in the available administrative review and appeal processes, thus they have exhausted administrative remedies.

11.      Defendants' denial of Plaintiff's administrative appeals were the final administrative actions of the U.S. Department of Agriculture Forest Service. Thus, the challenged decision is final and subject to this Court's review under the APA, 5 U.S.C. §§ 702, 704, and 706.

## III.  VENUE

12.     Venue is proper in this case under 28 U.S.C. § 1391 (e).  Defendant

Rick Cables, the Region 2 Regional Forester in the Rocky Mountain Regional

Office in Golden, Colorado, resides within Division of the United States District

Court for the District of Colorado.

## IV.  PARTIES

13.     Plaintiff FRIENDS OF THE NORBECK (FotN) is a South Dakota

non-profit corporation headquartered in Rapid City, S.D.  Formed in 2002, FotN is

dedicated to protecting the public lands on the Black Hills National Forest, in

general, and the Norbeck Wildlife Preserve and Black Elk Wilderness area in

particular. FotN members regularly hike, photograph, and recreate in the Norbeck

Project Area. FotN submitted substantive and extensive comments on the Norbeck

Wildlife Project.

14.     Plaintiff NATIVE ECOSYSTEMS COUNCIL (NEC) is a non-profit

Montana corporation with its principal place of business in Three Forks, Montana.

Native Ecosystems Council is dedicated to the conservation of natural resources on

public lands in the West. Its members use and will continue to use the Norbeck

Wildlife Preserve for work and for outdoor recreation of all kinds, including

hiking, bird-watching, wildlife viewing, and photography. The Forest Service's

unlawful actions adversely affect Native Ecosystems Council's organizational

interests, as well as its members' use and enjoyment of the Norbeck Wildlife Preserve, including the Project Area. Native Ecosystems Council brings this action on its own behalf and on behalf of its adversely affected members.

15.     Defendant RICK CABLES is the Regional Forester for Region Two of the United States Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at the National Forest level in the Rocky Mountain Region, including the Black Hills National Forest, are consistent with applicable laws, regulations, and official policies and procedures. Rick Cables is the highest official and representative of Defendant U.S. Forest Service in the District of Colorado.

16.     Defendant UNITED STATES FOREST SERVICE (Forest Service) is an administrative agency within the U.S. Department of Agriculture, and is responsible for the lawful management of our National Forests, including the Black Hills National Forest.

## V.  PROCEDURAL BACKGROUND

17.     On March 27, 2010 Black Hills District Ranger Lynn Kolund signed the Record of Decision authorizing the Norbeck Wildlife Project.

18.     On July 8, 2010 the Rocky Mountain Regional Office recommended that administrative appeals of the Record of Decision filed by FOTN and NEC be denied.

19.     On July 14, 2010 Appeal Deciding Officer Dennis Jaeger affirmed District Ranger Kolund's decision to implement the Project and denied Plantiffs' appeals. The decision constituted the final administrative determination of the Forest Service.

## VI. NORBECK WILDLIFE PRESERVE BACKGROUND

**Norbeck Wildlife Preserve**

20.     In 1905, a vision of the Nation's largest state park was born after Peter Norbeck paid a visit to the southern Black Hills. Peter Norbeck, a State Senator, Governor**,** and eventually a U.S. Senator, was obsessed with the idea of a park and worked for decades to manifest his ambitious goal to set aside beautiful landscapes as a game preserve. Norbeck's first step was the establishment of Custer State Forest (now known as Custer State Park) in 1912. Norbeck was concerned about dwindling game species such as bison and antelope. He estimated that only 15-50 deer were in the general area but that the grasslands and mountain country could support at least 4000 deer, 1000 buffalo, 1000 elk, 500 antelope and 150 mountain goats.

21.     In June of 1920, a Congressional act authorized the President to create the Custer State Park Game Sanctuary by setting aside 30,000 acres of Harney National Forest (now known as Black Hills National Forest) to adjoin the existing Custer State Forest "*for the protection of game animals and birds and to be*

*recognized as a breeding place therefore*." 16 U.S.C. § 675. Throughout time, boundaries were adjusted and acreages were added. In 1949, Congress renamed the federal portion of the Sanctuary the Norbeck Wildlife Preserve (NWP) after Peter Norbeck, who had passed away in 1936.

22.     The Norbeck Preserve contains rich and diverse wildlife habitat, including tracts of old growth forests, rock outcroppings, deep valleys and high mountains. Elevations range from 4,500 feet to the summit of Harney Peak, which at 7,242 feet is the highest point east of the Rockies. Because the Norbeck has been largely protected from extensive extractive uses (mining, logging, grazing) that characterize much of the Black Hills National Forest, Norbeck provides the finest old growth wildlife habitat within the Black Hills.

23.     Intensive timber management has virtually eliminated old growth forests within the Black Hills, and the tracts that remain are badly fragmented. The remaining old growth, except in the Norbeck Preserve, is largely found in isolated patches.

**Norbeck Wildlife Project Background**

24. "The purpose of the Norbeck Wildlife project is to meet habitat objectives for focus species[.]" NWP FEIS at 5.

25.     Despite this purpose, the FEIS admits that after logging, road

building, and other activities only "some [] species would be expected to return to the project area." NWP FEIS at 111.

26. The Norbeck Wildlife Project seeks to "enhance" wildlife habitat by logging and burning approximately 5,880 acres in the Norbeck Wildlife Preserve.

**Past Management Actions within the Norbeck**

In 1994 and 1995 the USFS approved two timber sales (Needles and Grizzly) in the Norbeck Wildlife Preserve.  Multiple environmental groups challenged the USFS management plans that authorized the Grizzly and Needles timber sales.  In 2001, the 10th Circuit enjoined the Forest Service from logging in the NWP because it relied on the broad mandate of the National Forest Management Act to manage for overall diversity instead of the more narrow NOA mandate to manage for game birds and animals. *Sierra Club-Black Hills Group v. U.S. Forest Service,* 559 F.3d 1281 (10th Cir. 2001).

**Rider Background**

27.    On August 2, 2002, President Bush signed into law a certain appropriations legislation which provided an additional legislative response to the terrorist attacks on the United States. An unrelated piece of legislation, the section 706 Rider, was attached to, and ultimately passed with, the underlying appropriations legislation. Section 706 of the "2002 Supplemental Appropriations Act for Further Recovery From and Response To Terrorist Attacks on the United

States," Public Law No:107-206 (Aug. 2, 2002) (hereinafter called the "706 Rider"). The 706 Rider provided for logging and the taking of other specific ground-disturbing actions in the Norbeck Wildlife Preserve that the 10th Circuit previously deemed unlawful.

**Memorandum Of Understanding**

28.    In addition to allowing logging in the Norbeck Wildlife Preserve, the 706 Rider required the Forest Service to enter into a Memorandum of Understanding (MOU) with the South Dakota Department of Game, Fish and Parks (SDGFP) to concur on program areas of responsibility and to review and recommend any needed changes to Norbeck Wildlife Preserve direction. Public Law 107-206, Sec. 706(i).

29.    On September 7, 2004, the Forest Service and SDGFP executed a MOU regarding the management and monitoring of the Norbeck Wildlife Preserve. Under that MOU, both parties cooperated in the development of a list of game animals and birds on which to focus habitat objectives for the Norbeck Wildlife Preserve. NWP FEIS at 2. The agencies entered into a subsequent MOU in 2009.

30.    The 2009 MOU contains the Forest Service's interpretation of the Norbeck Organic Act's mandate that the Norbeck Wildlife Preserve be utilized "*for the protection of game animals and birds and to be recognized as a breeding*

*place therefore*" by defining the words "game animals,"  "protection," and "breeding place."

**GRIEBEL 2007**

31.    The basis for the MOU "Definitions" and interpretation of the Norbeck Organic Act is found within a document the Forest Service refers to as Griebel 2007.

32.    Griebel 2007 "was developed by the Forest Service in cooperation [sic] South Dakota Game, Fish & Parks." Recommendation Memorandum for the Norbeck Wildlife Project 10-02-03-0025 at 14.

33.    Griebel 2007 was "instrumental in providing some of the foundational material used to build the purpose and need for the [Norbeck Wildlife Project.]" ROD at 4.

34.    Despite being either "tiered to" or "incorporated," Griebel 2007 was not subject to any NEPA analysis. *See* Record of Decision at 4-5.

**GAME ANIMALS**

35.    Griebel 2007 defines "game animals" as "[w]ild mammals or birds which breed in and/or occupy habitat within the Norbeck Wildlife Preserve that are legally hunted for food or sport." Griebel 2007 at 4.

36.    The 2009 MOU stated its intention to "manage the NWP in accordance with its original *spirit and intent*." MOU at 4 (emphasis added).

37.     Buffalo are native to South Dakota and once roamed within the boundaries of what is now the Norbeck Wildlife Preserve. Griebel 2007 at 6.

38.     Peter Norbeck "was concerned about dwindling game species such as bison[.]" Griebel at 1. He estimated that the grasslands and mountain country of the area could support at least 1000 buffalo. *Id.*

39.     Even though Buffalo once roamed within the boundaries of the Norbeck Wildlife Project, they are not considered a "game species," and thus cannot be reintroduced into the Norbeck Wildlife Preserve, because they do not currently exist there. *See* Griebel at 17.

38.     Other animal species have been "stocked," "restocked," and "reintroduced" into the boundaries of the NWP. Griebel at 6; 9; 16. When one species of bighorn sheep went extinct in 1916 due to uncontrolled hunting, a different species from Canada was introduced. Griebel at 17. Restocking of bighorn sheep into the Norbeck Wildlife Preserve has occurred as recently as 1999. Griebel at 17.

39.     Manitoban elk (*Cervus elaphus manitobensis)* were common in the Black Hills and surrounding prairies prior to 1870, but were extirpated due to over-harvesting by 1900. Rocky Mountain elk (*Cervus elaphus canadensis*) were transplanted into the Black Hills after 1900 and were successfully established by 1920.

40.     Mountain goats are not native to the Norbeck Wildlife Preserve. They were first introduced in 1924 from Canada. 14 mountain goats from Colorado were released into the NWP in 2006. NWP FEIS at 80.

**FOCUS SPECIES LIST**

40.     In addition to defining "game animals," Griebel 2007 also defined the "Focus Species" that are found on the 2009 MOU. NWP FEIS at 2; Griebel 2007 at 4; NWP FEIS Appendix I, I-101; I-15.

41.     "Focus Species" are game animals and birds selected to guide management in the Norbeck Wildlife Preserve. NWP FEIS at 77; Griebel 2007 at 11.

42.     Only 25 individuals, groups, and agencies were invited to comment on selection of the focus species. NWP FEIS at 7.  The selection was not subject to the NEPA process. *See* ROD at 5.

43.     Plaintiffs' Administrative Appeal questioned the "Focus Species List" (Griebel 2007) because they thought it contained numerous species in questionable need of sanctuary within the NWP. FotN Appeal at 49.

44.     The American Bison was not chosen as a focus species because it does not currently occur in the Norbeck Wildlife Preserve; because the BHNF Forest Plan directs the forest not to re-introduce bison into the NWP; and because

the American Bison is not a game species outside of Custer State Park. Griebel at 17.

45.    Even though Focus Species drive management of the Norbeck Wildlife Project, Plaintiffs were not afforded the opportunity to offer NEPA comments on the criteria for selecting Focus Species.

46.    Plaintiffs suggested other species such as the mountain lion be placed on the "Focus Species" list. FotN Appeal 49.

47.    In response, the Forest Service stated that the Focus Species list "has been addressed in the FEIS pages 133-168 and adequately demonstrates that wildlife needs will be met." Recommendation Memorandum for the Norbeck Wildlife Project 10-02-03-0024.

48.    The FEIS pages 133-168 does not address why mountain lions were not added to the Focus Species list.

49.    Comments on the Draft EIS also questioned the validity of the Focus Species list. FEIS Appendix I, I-120; I-101, I-15.

50.    In response, the Forest Service claimed the selection of Focus Species was outside the scope of the EIS. NWP FEIS Appendix I, I-101. The agency also directed the commenter to the definition of "game animal" in Griebel 2007 for determinations of why the mountain lion and others were not chosen as a Focus Species. *Id.*

51.    The mountain lion is a game species according to South Dakota. Griebel 2007, Appendix A at 47.

52.    According to Griebel 2007, the factor limiting mountain lions from being placed on the Focus Species list may have be prey presence rather than habitat. Griebel 2007, Appendix B at 52.

53.    Nonetheless, Griebel states that it is not attempting to preserve game animals from predators. Griebel 2007 at 8.

54.     Elk are prey of mountain lions and their numbers are near population objectives. Mystic Range DEIS at 188.

55.    Griebel 2007 also stated that "it is more logical to use deer, elk, mountain goats and bighorn sheep to guide management because habitat relationships are better known." *Id.*

56.    The public did not have the opportunity to comment on the conclusions found in Griebel 2007 or offer opposing scieintific viewpoints through the NEPA process.

**BEST AVAILABLE SCIENCE & OPPOSING VIEWPOINTS**

57.    In its Administrative Appeal, Plaintiff Native Ecosystems Council questioned whether science exists that demonstrates clearcutting increases forage for elk. Administrative Appeal at 9. Plaintiffs cited to a study in the Custer State

Park that stated the quality of cover and forage required by big game are often not provided from clearcuts. *Id.* at 10.

58.     The agency did not directly address or analyze the studies cited by Plaintiffs.

59.     Instead, the agency stated that:

> The beneficial effect on forage species as a result of opening a dense stand of trees to allow more water and light is commonly understood by range, wildlife, and silvicultural professionals and does not need reference to specific studies.

Recommendation Memorandum for the Norbeck Wildlife Project 10-02-03-0025 at 7.

60.     NEPA requires the Forest Service to discuss any responsible opposing scientific view to the "fullest extent possible." *See* 40 C.F.R. §1502.9(b); *id.* § 1500.2.

61.     The Forest Service did not discuss or analyze the scientific studies cited by Plaintiffs. *See* NWP FEIS, Wildlife Specialist Report at 27; 121.

62.     Despite failing to consider the studies cited by Plaintiffs, the Forest Service still claimed that it "considered the best science available." NWP FEIS, Wildlife Specialist Report at 119.

63.     NEPA requires the Forest Service to make available to the public high

quality information, including accurate scientific analysis, expert agency comments, and public scrutiny—before decisions are made and actions are taken. 40 C.F.R. § 1500.1(b).

64.     The Forest Service did not state why the science it relied upon—an internal memorandum that was not peer-reviewed—was the best available science. NWP FEIS, Wildlife Specialist Report at 119.

65.      The Song Sparrow is a Focus Species. NWP FEIS at 5.

66.     Plaintiff NEC questioned whether thinning in the NWP would increase the song sparrow's susceptibility to cowbird parasitism. Plaintiff's Administrative Appeal at 16. Plaintiff cited to scientific studies.

67.     The Government did not respond to Plaintiff's viewpoint that cutting in the NWP would increase the song sparrow's susceptibility to cowbird parasitism. Recommendation Memorandum For the Norbeck Wildlife Project 10-02-03-0025 at 10.

68.     The wildlife specialist report makes no mention of Cowbird parasitism in the song sparrow sections. NWP FEIS, Wildlife Specialist Report, 49; 60.

**GRAZING IN THE NORBECK PRESERVE**

69.     The BHNF Forest Plan permits livestock grazing in the Norbeck Wildlife Preserve. NWP FEIS 3-238.

70.     Livestock grazing is permitted on approximately 8% of the project area. NWP FEIS 3-241; *see also id.* at 250.

71.     The Palmer Gulch grazing allotment is within the Project area boundary. NWP FEIS at 238.

72.     There is conflict amongst focus species and grazing livestock for forage.  NWP FEIS at 111.

73.     The Forest Service is in the process of changing its management scheme for grazing in the "Mystic Range Project." NWP FEIS 3-251. The change is subject to the NEPA process and is considered a reasonably foreseeable activity. NWP FEIS Appendix F-5.

74.     The Forest Service is required to consider cumulative impacts in its NEPA analysis. 40 C.F.R. §1508.25(c)(3).

75.      A cumulative impact is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency or person undertakes such other actions." 40 C.F.R. § 1508.7.

76.     The Norbeck Wildlife Project does not evaluate the cumulative impacts of cattle grazing in the Project Area on each focus species individually.

77.     Instead, the FEIS contains a cumulative impacts analysis for all species in one section of the FEIS. NWP FEIS 3-111.

78.     The cumulative impacts section limits its analysis of how livestock grazing impacts focus species and their habitat to one sentence:

> All alternatives are expected to increase forage (grasses/forbs and browse) for these species, which may incrementally reduce conflicts and competition with grazing livestock.

NWP FEIS 3-111.

79.     The Mystic Range Draft EIS documents how livestock grazing can impact Focus Species, but did not specifically document how grazing, combined with cutting trees, will cumulatively impact these species in the Norbeck Wildlife Project Area.

80.     Big horn sheep were selected as a focus species to represent foraging and stand habitat diversity.

81.     Big horn sheep compete with livestock for forage. NWP FEIS 3-83.

82.     A limiting factor in big horn sheep habitat is competition for forage and space with livestock. NWP FEIS 3-83.

83.     The song sparrow is a focus species. NWP FEIS at 5.

84.     Livestock grazing can degrade song sparrow habitat. Mystic Range DEIS at 140.

85.     In addition, livestock grazing can increase the risk of predation on eggs or chicks. Mystic DEIS 141.

86.     The Ruffed Grouse is a focus species. NWP FEIS 1-5.

87.    Livestock grazing can have direct effects on the grouse such as potential mortality from crushing grouse eggs or chicks, knocking eggs or chicks out of nests, or covering nests with manure. Mystic Range DEIS at 149.

88.    Livestock grazing can also impede the succession of aspen stands by browsing aspen leaders, compacting soil, and creating trails for predators. Mystic Range DEIS at 149.

89.    Livestock grazing can also negatively impact ruffed grouse by changing vegetation structure and food supplies.

90.    "The overall available habitat for ruffed grouse would improve if livestock grazing is no longer allowed on these allotments." Mystic Range 149

91.    While-tailed deer and elk are focus species. NWP FEIS at 5.

92.    The impacts to white-tailed deer and elk were analyzed together because their requirements and habitat objectives are the same. NWP FEIS 86.

93.    Many of the shrub and forb species that benefit deer are also palatable for livestock. Mystic Range DEIS 150.

94.    Competition for forage from livestock has altered distribution and habitat use of deer. Mystic Range 159.

95. Deer and elk compete for forage with livestock. This competition increases in the late summer. Mystic Range DEIS at 150.

96. Elk avoid livestock in the summer. Mystic Range DEIS 155.

97.    One Forest Service study found that:

Elk diets overlap more closely with cattle and forage competition can be a management concern on both summer and winter ranges. When cattle are allowed to graze all summer on deer and elk winter ranges, competition for forage may increase sharply. Additionally, cattle displace elk through space competition.

98.    The overall habitat for deer would improve in the absence of grazing. Mystic Range DEIS at 155.

99.    Grazing is "expected to contribute to cumulative effects [on white-tail deer]." *See* Mystic Range DEIS at 159.

100.    "The overall available habitat for elk would improve in the absence of grazing[.]" Mystic Range DEIS at 189.

101.    Grazing is "expected to contribute to cumulative effects on elk." *See* Mystic Range DEIS at 190.

102.    Several concerns with grazing and turkey habitat management include reducing foraging habitat and nesting habitat. Loss of food sources including insects, grasses, and forbs can occur. Mystic Range DEIS at 191.

103.    Reducing the grazing effects on this browse species (e.g., aspen, willow) would improve nesting sites. Mystic Range DEIS at 192.

104.    Livestock grazing is expected to contribute to cumulative impacts. Mystic Range DEIS at 194.

105.    Grazing impacts the mountain bluebird. Impacts may come

from possible nest disturbance and associated nesting failure (loss of eggs and hatchlings) resulting from activities related to livestock grazing such as maintenance and reconstruction of range improvement structures (e.g. fence line clearing). Grazing could reduce plant species diversity and reduce important food sources if changes in the understory vegetation occur where specific plants to provide food and oviposition sites for prey species are removed. Mystic Range DEIS at 194.

106.   Livestock grazing poses one of the greatest threats to the song sparrow.  *See* Mystic Range DEIS at 139. Livestock grazing in riparian areas can degrade song sparrow habitat by removing woody vegetation, destroying nests, and increase parasitism and predation rates. Mystic Range DEIS at 140.

107.   The mountain goat is distributed from southeast Alaska through the Canadian Rockies to various mountain ranges in the northern US. The goat was introduced to the Black Hills in 1924, and became established in only one area: the Black Elk Wilderness and Norbeck Wildlife Preserve region.

108.   Livestock compete with mountain goats for forage. Mystic Range DEIS at 182-83.

109.   A 2007 survey suggests a current population of only 60 goats. Mystic Range DEIS at 183.

110.   The overall available riparian and hardwood habitat for goats would

improve if livestock grazing were no longer allowed in mountain goat home ranges. Available habitat for this species would improve if competition between mountain goat and livestock was no longer allowed. Mystic Range DEIS at 183.

111.   Livestock grazing is expected to contribute to the cumulative effects of the Black Backed woodpecker, brown creeper, and golden kinglet. *See* Mystic Range DEIS at 138. Removal of livestock grazing would likely increase available watering habitat for these species by raising water tables, and increasing riparian vegetation cover and composition that would protect them from predators. Mystic Range DEIS at 136.

112.   The Mystic Range DEIS does not contain an analysis of the site-specific cumulative impacts that livestock grazing would have on the Focus Species' habitat within the Norbeck Wildlife Preserve.

**GRAZING ALTERNATIVES**

113.   Forest Plan guidelines direct the Forest Service to "[t]ake advantage of opportunities to transfer forage use from livestock to wildlife." BHNF Forest Plan 3-101.

114.   NEPA requires an agency to rigorously explore and objectively evaluate all reasonable alternatives. 40 C.F.R. §1502.14.

115.   Plaintiffs suggested the Forest Service consider an alternative that eliminated livestock grazing from the Norbeck Wildlife Preserve. FotN Administrative Appeal at 29.

116.   The Forest Service did not consider an alternative that eliminated livestock grazing because it considered changes to livestock grazing "outside of the scope of the project." NWP FEIS at 129.

117.   "The purpose of the Norbeck Wildlife project is to meet habitat objectives for focus species[.]" NWP FEIS at 5.

118.   The "habitat objective" for the mountain goat, bighorn sheep, elk, white-tailed deer, and turkey is "forage enhancement." NWP FEIS at 78 Table 38.

119.   Livestock compete with mountain goats for forage. Mystic Range DEIS at 182-83.

120.   Big horn sheep compete with livestock for forage. NWP FEIS 3-83.

121.   A limiting factor in big horn sheep habitat is competition for forage with livestock. NWP FEIS 3-83.

122.   Deer and elk compete for forage with livestock. Mystic Range DEIS at 150.

123.   Grazing reduces foraging habitat for turkeys. *See* Mystic Range DEIS at 191.

**SNAGS**

124.   Snags are standing dead trees. NWP FEIS at 300.

125.   Plaintiffs' Appeal claimed that the agency failed to disclose the

number of snags in the project area currently and after implementation of the Project. FotN Administrative Appeal at 42-48.

126.   In response, the agency claimed the FEIS and Specialist report addressed the issue. Recommendation Memorandum for the Norbeck Wildlife Project 10-02-03-0024 at 9.

127.   Neither Chapter 3 of the FEIS nor the Specialist Report discloses the actual number of snags that currently exist in the project area or the number that would exist after implementation.

128.   The Specialist Report contains the methodology used for snag predictions in the project area. The methodology assumes that location 030210 is representative of the project area. Project File, Silviculture Report at 65.

129.   The Report did not explain how it was determined that location 030210 is representative of the project area.

130.   Plaintiffs submitted extensive comments on how snag predictions in the FEIS are skewed because predictions and methodology regarding mountain pine beetle are flawed.

**WATER**

**Clean Water Act**

131.   The Clean Water Act (CWA) was adopted to "restore and maintain

the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

132.  The CWA requires that states develop water quality standards for intrastate waters.  33 U.S.C. § 1313.

133.  In determining the water quality standard of a particular water body, the state must first determine the designated beneficial use of the water body and then set water quality standards that protect that use.  33 U.S.C. § 1313(c)(2)(A); 40 C.F.R. § 130.10.

134.  Each beneficial use has water quality parameters.

135.  The CWA requires states to establish a list of water bodies that fail to meet the parameters of their designated beneficial use.  33 U.S.C. § 1313.

136.  The CWA requires that each state establish a Total Maximum Daily Load (TMDL) for each impaired water body.  33 U.S.C. § 1313(d).

137.  The TMDL determines the maximum amount of a pollutant that can be discharged into a water body daily.  33 U.SC. 1313(d).

138.  Heat and sediment are defined as pollutants under the CWA. 33 U.S.C. § 1362(6).

139.  The CWA requires that federal agencies comply with state water laws regarding the control and abatement of water pollution.  33 U.S.C. § 1323.

140.  South Dakota water law lists Coldwater Permanent Fish Life

Propagation (CPFLP) as a beneficial use of state waters.  Admin.R.S.D., 74:51:01:42.

141.   CPFLP requires that the water temperature remain less than or equal to 65 degrees Fahrenheit.  Admin.R.S.D., 74:51:01:45.

142.   CPFLP requires that suspended solids remain less than or equal to 30 mg/L over a 30-day average or a daily maximum of less than or equal to 53 mg/L. Admin.R.S.D., 74:51:01:45.

143.   South Dakota water law requires that "[n]o further reduction of water quality [] be allowed for surface waters of the state that do not meet the water quality levels assigned to their designated beneficial uses as a result of natural causes or conditions… ."  Admin.R.S.D., 74:51:01:34.

**Impaired Waters**

144.   The Project Area includes the watershed of Upper Battle Creek.

145.   The designated use of Upper Battle Creek is Coldwater Permanent Fish Life Propagation Waters (CPFLP).  NWP FEIS at 212.

146.   Upper Battle Creek has been identified by South Dakota as failing to meet water quality standards and is therefore on South Dakota's CWA § 303(d) list.  NWP FEIS at 212.

146.   Upper Battle Creek is on the CWA 303(d) list because its water

temperature is greater than 66 degrees Fahrenheit, the required maximum

temperature for CPFLP. NWP FEIS at 212.

147.   The reason for its failure to meet required maximum temperatures is

listed as natural causes.  NWP FEIS at 212.

148.   No TMDL assessment has been initiated on Upper Battle Creek to

determine what natural causes are creating the impairment or possible remedies.

http://denr.sd.gov/dfta/wp/tmdlpage.aspx#Minnesota

149.   Horsethief Lake is also on South Dakota's CWA § 303(d) list as an

impaired water body.  NWP FEIS at 212.

150.   Horsethief Lake is in the Upper Battle Creek Watershed.

151.   The determined beneficial use of Horsethief Lake is also CPFLP.

NWP FEIS at 212.

152.   Horsethief Lake fails to meet the required maximum temperature of

65 degrees Fahrenheit and fails to meet the required pH for CPFLP.  NWP FEIS at

212.

153.   The reason for failure to meet water quality parameters of its

beneficial use is listed as natural causes.

154.   No TMDL has been initiated on Horsethief Lake to determine what

natural causes are creating the impairment or possibly remedies.

http://denr.sd.gov/dfta/wp/tmdlpage.aspx#Minnesota

**NEPA**

155.   NEPA was enacted in 1969 to ensure that procedural safeguards are in place before an agency takes action significantly affecting the human environment. 42 U.S.C. § 4332(2)(C).

156.   The goal of NEPA is to ensure that agencies have the necessary information available to closely consider environmental impacts of a proposed project.

157.   "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.1.

158.   The goal of NEPA is two-fold: (1) to ensure that the agency will have available and will carefully consider detailed information on significant environmental impacts when it makes decisions; and (2) to "guarantee that the relevant information will be made available to the larger audience that may also play a role in both the decision-making process and the implementation of that decision." *Robertson v. Methow Valley Citizens*, 490 U.S. 332, 349 (1989); 40 C.F.R. §1501.2(b).

159.   NEPA requires that agencies take a "hard look" at the environmental impacts of agency action.

160.   In taking a "hard look" at the environmental impacts of a project, an agency must rely on accurate scientific analysis. 40 C.F.R. § 1500.1(b).

161.   "Agencies shall insure the … scientific integrity of the discussions and analysis in environmental impact statements."  40 C.F.R § 1502.24.

162.   "Accurate scientific analysis … [is] essential to implementing NEPA." 40 C.F.R. § 1500.1(b).

163.   BMPs are "mitigation measures" intended to protect soil and water quality, a thorough analysis of which is required under the NEPA process.

**Temperature**

164.   The NWP FEIS does not analyze the effects of logging and thinning on water temperature.

165.   The NWP FEIS simply states that the logging will have a positive effect on temperature because it will decrease evapotranspiration thereby increasing the amount of water in streams. NWP FEIS at 212.

166.   In making this assertion, the FEIS does not rely on any scientific study, data, or specific impact assessment of the current project that shows there will be a positive effect from logging on stream temperature. *Id*.

167.   Citing USFS publication (USDA Forest Service 2003b), the FEIS states:

> Streamflows throughout the Black Hills have been reduced over the last century, which is likely a result of fire suppression and the associated increase of woody biomass (trees).  Higher leaf area … increases evapotranspiration.  NWP FEIS at 212.

168.   The USFS Soil & Watershed Specialists Report (S&WSR) for the

Project cites the same Forest Service publication and states that the decrease in streamflows in the Black Hills is a result of fire suppression because it causes an increase in leaf area, woody biomass, and evapotranspiration. Project File, S&WSR at 34 (Mar. 2010).

169.   The USFS Forest Service publication that the FEIS and S&WSR cite to as the authority on the effects of logging on stream temperature is not a scientific journal.  It is a USFS publication that cites the opinion of a USFS Forest Service scientist. Project File, USDA Forest Service 2003b.

170.   There is no scientific study of the project area, no data, and no impact assessment of the proposed logging on water temperature.

**Water Influence Zone**

171.   The Water Influence Zone (WIZ) in the NWP is a 100 foot buffer on either side of a stream designed to protect the stream from disturbance.  Project File, S&WSR at 51.

172.   Alternative 4 implements 240 acres of logging in the WIZ. NWP NWP FEIS at 213.

173.   Alternative 4 implements 436 acres of prescribed burning in the WIZ. *Id.*

174.   Logging in the Water Influence Zone would increase solar infiltration and ambient air temperature in the 200 yard buffer around water bodies.

175.   Regarding the impact of logging and prescribed burning in the WIZ on water bodies in the project area, the NWP FEIS states that the potential for sediment in Alternative 4 (the chosen alternative) is a "slight increase" compared to Alternative 1 (the no action alternative).  NWP FEIS at 213.

176.   How the USFS concludes that logging in the WIZ will only result is a "slight increase" is not supported by any scientific assessment or data.

177.   There is nothing in the NWP FEIS showing an actual measurement of how much sediment is produced in a "slight increase".  NWP FEIS at 213.

178.   The NWP FEIS states:

Mechanical vegetation treatments and prescribed fire within the Water Influence Zone (WIZ) can impact factors which contribute to water quality and overall stream health.  However, with implementation of Forest Plan Standards and Guidelines (FPS&G) which include WCPs and BMPs potential impacts would be reduced.  NWP FEIS at 213.

179.   The NWP FEIS states:

Maintenance and temporary use of roads within the WIZ and at stream crossings have the potential to increase sediment. … It is extremely difficult to quantify how much sediment would be produced.  NWP FEIS at 214.

180.   There is no scientific assessment of how much sediment will be produced by treatments in the WIZ.

**Roads**

181.   The FEIS states that "[r]oads are generally the number one watershed

concern in a project area.  Roads tend to concentrate water and put it where it is not designed to go."  NWP FEIS at 212.

182.   According to the NWP FEIS, there are currently 127.1 miles of road in the Project Area with a density of 1.9 miles of road per square mile within the National Forest area of the Project.  NWP FEIS at 257.

183.   The Project will use the road system already in place.  However, many of these roads are presently unauthorized or closed.  The Project will open closed roads and utilize unauthorized roads for machinery traffic and hauling during Project implementation.  NWP FEIS at 256-57.

184.   There are 26.3 miles of completely closed roads in the Project area. 11.9 of those miles will be opened for machinery traffic and hauling during Project implementation.  NWP FEIS at 257.

185.   There are 2.1 miles of seasonally closed roads in the Project area. 1.2 of those miles will be opened year round for machinery traffic and hauling during Project implementation.  *Id*.

186.   There are 37.9 miles of unauthorized roads in the Project area.  22 of those miles of unauthorized roads will be used for machinery traffic and hauling during Project implementation.  NWP FEIS at 257.

187.   The NWP has restriction on the amount of roads allowed in the Preserve.  NWP FEIS at 212.

188.    There is an additional 41.5 miles of US highway and country road in the area and another 13.9 miles of open Forest Service roads that will be used in the logging project.  NWP FEIS at 257.

**Water Quality and Stream Health**

189.    Sediment is a problem in the Project area. Project File S&WSR at 51.

190.    The FIES states:

Connected Disturbed area [sic] (CDAs) are areas that contribute sediment to streams or wetlands causing degradation of physical function and water quality, and increase peak flows that may alter physical channel processes. …  During the field inventory, 28 CDAs were identified in the project area. NWP FEIS at 212.

191.    The S&WSR states:

CDAs are those disturbed areas that drain directly into streams and disturbed areas in close proximity to streams that are most likely to be hydrologically connected.  CDAs allow sediment and associated pollutants to reach streams causing decreased habitat, decreased water quality, and increased risk of flood damage. Project File, S&WSR at 28.

192.    Each of the 28 CDAs is contributing sediment to a water body in the Project Area.  Project File, S&WSR at 40-42.

193.    The National Watershed Sensitivity Index (NWSI) is used to assess the sensitivity of a watershed to impacts.

194.    Watershed sensitivity is determined by 1) riparian areas/streamside management zones; 2) severely erodible soils, and 3) slopes greater than 60%. NWP FEIS at 209; Project File, S&WSR at 28.

195.   Every watershed in the project area is listed as either moderate or high sensitivity.  NWP FEIS at 209;  Project File, S&WSR at 28.

196.   The S&WSR states:

There are several reasons why these [NWSI] ratings are high.  The big one is the large amount of soils with severe erosion rating.  There is also a high percentage of perennial and intermittent streams and steep slopes also play a role.  These index numbers are some of the highest in the Black Hills and it has a lot to do with geology.  Project File, S&WSR at 28-29.

197.   Stream health is defined as "the condition of a stream versus reference conditions for the stream type and geology" (USDA Forest Service 2006b)and is used as an indicator of water quality. Project File, S&WSR at 35.

198.   A stream health rating (SHR) is assigned to each stream in the project area.

199.   Battle Creek, Buckeye Gulch, and Johnson Canyon are all streams in the project area that are considered to have a SHR of "Diminished." Project File, S&WSR at 35-36.

200.   Buckeye Gulch is listed as and SHR of "Diminished" specifically due to sediment.  Project File, S&WSR at 35.

201.   Iron Creek, No-Name Gulch, Palmer Creek, and Rabbit Gulch are all listed with a SHR of "At-Risk." Project File, S&WSR at 35-37.

202.   The FEIS explains that the majority of the streams in the project area

have a Stream Health Rating (SHR) of Robust but that some have an SHR of

Diminished or At-Risk "due mainly to impacts from roads and trails or where

stream channels were moved."  NWP FEIS at 212.

203.   The FEIS does not explain, and the USFS does not scientifically

explore how much sediment is already present in water bodies in the Project Area.

204.   There is no scientific assessment of the amount of sediment in tons

that would enter the stream or how the sediment will affect water quality or stream

health in the Project area.

205.   "Sediment is a concern within the NWPA because the types of soils

present and the extensive stream network.  The soils are very erosive, when the

organic cover is removed or if the water is concentrated on them." Project File

S&WSR at 51.

206.   In the Upper Battle Creek Watershed, Upper and Lower Iron Creek

Watershed, Spokane Creek Watershed, and Spring Creek/Sunday Gulch

Watershed, the S&WSR states:

> Timber harvest will have cumulative impacts to the aquatic ecosystem from
> sediment.  Short-term sediment will added (sic) to the long-term sediment
> from the roads and trails. … With prescribed fire, … there will be short-term
> cumulative effects to the aquatic ecosystem from sediment adding to the
> short-term timber harvest, and long term sediment from roads. Project File,
> S&WSR at 71-79.

207.   For Palmer Creek Watershed and the S&WSR states:

Timber harvest will have cumulative impacts to the aquatic ecosystem from sediment.  Short-term sediment will added (sic) to the long-term sediment from the roads and trails and past short-term sediment from timber harvest. … With prescribed fire, … there will be short-term cumulative effects to the aquatic ecosystem from sediment adding to the short-term timber harvest, and long term sediment from roads.  Project File, S&WSR at 80-81.

208.   57% of the NWPA has a slope angle of 20% or greater. Project File, S&WSR at 27.

209.   Soils in the project area were assessed and a significant portion of the Project Area received a Very High Erosion Hazard Rating (VHEHR).  Project File, S&WSR at 24, 111.

210.   The FEIS states that the potential to generate sediment is low when the FPS&G including Best Management Practices (BMPs) and Water Conservation Practices (WCPs) are implemented. NWP FEIS at 213.

211.   The FEIS does not explain, and the USFS does not explore, how much sediment the Project will generate and deposit into water bodies after the implementation of WCPs and BMPs.

212.   The NWP FEIS simply states that the implementation of WCPs and BMPs will "reduce" the impacts and that the potential to generate sediment is "low."

213.   The NWP FEIS does not explain, and the USFS does not explore, the

ability of each water body to assimilate the amount of sediment that will be generated from logging and burning in the WIZ and in the remainder of the project area.

**NFMA**

214.   The Land and Resource Management Plan (LRMP) for the BHNF lists general Forest Plan Standards for soils and water and then cross references them to the associated WCP.  LRMP at II-3 to II-10.

215.   The WCPs incorporate design criteria into the associated standard. Project File, S&WSR at 11-18.

216.   The S&WSR states:

The LRMP … lists Standards and Guidelines for the different resources. Standards and Guidelines are used to determine if individual projects are in compliance with the LRMP.  The following Standards and Guidelines are applicable to the soils, water riparian areas, WIZ (water influence zone) and wetlands for the NWPA. Project File, S&WSR at 11-18.

217.   The S&WSR also lists the general Forest Plan Standards in combination with the associated WCP design criteria and states that these are the "Standards" for the BHNF.  Project File, S&WSR at 11-18.

218.   The Forest Plan for the BHNF and the S&WSR state that Standard #1301 is equivalent to WCP #3.  Forest Plan standard #1301 and WCP #3 state:

In the WIZ next to perennial and intermittent streams, lakes, and wetlands allow only those actions that maintain or improve long-term stream health and riparian ecosystem condition.

    a.  Allow no action that will cause long-term change to a lower stream health class in any stream reach.  In degraded systems (that is At-risk or Diminished stream health class), progress towards robust stream health within the next plan period. BHNF LRMP at II-9; S&WSR at 17.

219.   The Forest Plan for the BHNF and the S&WSR state that Standard #1106 is equivalent to WCP #11.  Forest Plan Standard # 1106 and WCP # 11 state that the Forest Service must:

Stabilize and maintain roads and other disturbed sites during and after construction to control erosion.
    a.  Do not encroach fills or introduce soil into streams, swales, lakes, or wetlands. BHNF LRMP at II-5; S&WSR at 13.

220.   The Forest Plan for the BHNF and the S&WSR state that Standard # 1116 is equivalent to WCP #1.  Standard # 1116 and WCP #1 state that the Forest Service must:

Manage land treatments to conserve site moisture and to protect long-term stream health from damage by increased runoff. BHNF LRMP at II-6; S&WSR at 16.

221.   Forest Plan Standard #1201 requires the Forest Service to:

Conduct actions so that stream pattern, geometry, and habitats are maintained or improved towards Robust stream health. BHNF LRMP at II-7.

# Claims for Relief

## FIRST CLAIM FOR RELIEF

The Forest Service's interpretation of "*for the protection of game animals and birds and to be recognized as a breeding place therefore*" violates the Norbeck Organic Act.

222.   All previous paragraphs are incorporated by reference.

223.   The 2009 MOU interprets the term "game animals" so that the Forest Service can "properly manage the NWP in accordance with its original spirit and intent." MOU at 4.

224.   Peter Norbeck, the driving force behind the creation of the Norbeck Wildlife Preserve, thought the Preserve should be a refuge for the American Buffalo and other animals that were extirpated by human activities.

225.   The Forest Service violated the spirit and intent of the Norbeck Organic Act by defining the term "Game Animal" too narrowly. The interpretation and criteria for being considered a "Game Animals" precludes the American Bison and other animals from being considered a Focus Species.

## SECOND CLAIM FOR RELIEF

The FEIS violated NEPA by tiering to or relying upon Griebel 2007 without subjecting it to any NEPA analysis.

226.   All previous paragraphs are incorporated by reference.

227.   The FEIS violated NEPA to the extent it tiered to or relied upon

Griebel 2007 without first subjecting it to NEPA analysis.

## THIRD CLAIM FOR RELIEF

The Forest Service Violated NEPA by failing to adequately address opposing viewpoints and by failing to ensure accurate scientific analysis.

228.   All previous paragraphs are incorporated by reference.

229.   NEPA requires the Forest Service to discuss any responsible opposing view to the "fullest extent possible." *See* 40 C.F.R. §1502.9(b); *id.* § 1500.2.

230.   In addition, NEPA requires the Forest Service to make available to the public high quality information, including accurate scientific analysis, expert agency comments and public scrutiny, before decisions are made and actions are taken. 40 C.F.R. § 1500.1(b).

231.   The Forest Service violated NEPA by failing to address opposing scientific viewpoints raised by Plaintiffs for elk, song sparrows, and other wildlife species.

232.   The agency violated NEPA by failing to respond to Plaintiff's opposing scientific viewpoints.

## FOURTH CLAIM FOR RELIEF

The Forest Service Violated NFMA by failing to consider the best available science.

233.   All previous paragraphs are incorporated by reference.

234.   NFMA requires the Forest Service to consider the Best Available Science in project planning. 36 C.F.R. §219.35, App. B.

235.   The Forest Service violated the NFMA mandate by failing to explain how the scientific documents it relied upon are the Best Available Science.

236.   The Forest Service violated NFMA by failing to consider science offered by Plaintiffs.

## FIFTH CLAIM FOR RELIEF

<u>The Forest Plan standards that allow livestock grazing in the Norbeck Wildlife Preserve violate the Norbeck Organic Act.</u>

237.   All previous paragraphs are incorporated by reference.

238.   The Forest Plan allows grazing in the Norbeck Wildlife Preserve.

239.   Focus Species and other wildlife species compete with livestock for forage.

240.   Livestock grazing destroys the habitat of focus species and other wildlife.

241.   Forest Plan standards that permit livestock grazing in the Norbeck Wildlife Preserve are in violation of the Norbeck Organic Act's mandate that the Preserve be used "*for the protection of game animals and birds and to be*

*recognized as a breeding place therefore."*

## SIXTH CLAIM FOR RELIEF

The FEIS violated NEPA by failing to adequately consider the cumulative impacts of grazing.

242.   All previous paragraphs are incorporated by reference.

243.   NEPA requires the Forest Service to consider cumulative impacts in its NEPA analysis. 40 C.F.R. §1508.25(c)(3).

244.   Livestock grazing in the Norbeck Wildlife Preserve will have cumulative impacts that were not adequately addressed in the Norbeck Wildlife Project FEIS.

## SEVENTH CLAIM FOR RELIEF

The FEIS violated NEPA by failing to consider in detail an alternative that would eliminate grazing from the Norbeck Wildlife Preserve.

245.   All previous paragraphs are incorporated by reference.

246.   The Forest Service violated NEPA by failing to adequately consider in detail an alternative that would eliminate livestock grazing.

## EIGHTH CLAIM FOR RELIEF

The FEIS violated NEPA's requirement for accurate scientific methodology and by failing to disclose the number of snags that currently exist in the Project Area and by failing to disclose the number of snags that would exist after project

implementation.

247.   All previous paragraphs are incorporated by reference.

248.   The FEIS violated NEPA by failing to disclose the number of snags that currently exist in the Project Area and by failing to disclose the number of snags that would exist after project implementation.

249.   The FEIS violated NEPA by failing to state the basis for its assumption that location 030210 is representative of the Project Area.

250.   The FEIS violates NEPA because its snag methodology relies on flawed assumptions.

## NINTH CLAIM FOR RELIEF

The USFS decision to implement the Project is arbitrary and capricious and violates the CWA because logging will increase temperatures and sediment in already impaired water bodies in violation of state law.

251.   All previous paragraphs are incorporated by reference.

252.   The CWA requires that all federal actions comply with state laws concerning the control and abatement of water pollution.

253.   South Dakota water law requires that there be no further degradation of water quality in water bodies already deemed impaired by natural causes.

254.   A water body is impaired if it fails to meet the requirements of its designated beneficial use.

255.   Upper Battle Creek and Horsethief Lake are both deemed impaired due to natural causes.

256.   No assessment of the cause or possible remedies to the impairments of these water bodies has been initiated.

257.   Removal of canopy cover around water bodies can increase solar penetration and ambient air temperature.

258.   There will be an increase in sediment in the Upper Battle Creek watershed.

259.   Maintenance and temporary use of roads in within the WIZ has the potential to increase sediment.

260.   Any increase in temperature or sediment, no matter how slight, in Upper Battle Creek or Horsethief Lake will degrade a water body already deemed impaired in violation of South Dakota water law and the CWA.

## TENTH CLAIM FOR RELIEF

The USFS decision to implement the project is arbitrary and capricious and violates NEPA because it fails to adequately consider the effects of the Project on water quality in the Project area.

262.   All previous paragraphs are incorporated by reference.

263.   The Forest Service does not know the effects of the Project on water temperature of streams and lakes in the project area.

264.   The entire analysis of effects on temperature in the FEIS rests in a single opinion of a USFS scientist form a single unscientific publication.

265.   There is no scientific data on how the logging will effect water temperature in the Project area.

266.   The USFS does not know how increased sediment will impact water quality in water bodies in the Project area.

267.   There is ample information in the FEIS and the S&WSR demonstrating that soils in the Project area are highly erosive, that slopes in the Project area are highly gradient, and that sediment is a problem in the Project.

268.   There are already 28 CDAs that contribute sediment to water bodies in the Project area.

269.   The USFS does not know, and makes no scientific assessment of the current sediment loads in streams in the Project area.

270.   The USFS does not know, and makes no assessment of the amount of sediment in tons that will be generated by the project.

271.   The USFS admits to not having assessed, and not knowing, the amount of sediment will be produced by the project in the FEIS stating "it is extremely difficult to quantify how much sediment would be produced."

272.   The Forest Service does not know, and makes no assessment to

determine whether the receiving water bodies can assimilate the unknown amount of sediment that will be produced by the Project and still meet water quality standards.

273.   Even if BMPs and WCPs are followed the Forest Service does not know the amount of sediment that will be produced by the project or whether the receiving water bodies can assimilate it.

274.   The Forest Service violated NEPA in implementing this Project because it failed to take a "hard look" and effectively assess the impacts of the Project on water quality and stream health.

## ELEVENTH CLAIM FOR RELIEF

The USFS decision to implement the project is arbitrary and capricious and violates NFMA because it fails to follow Forest Plan Standards that aim to protect water quality and watershed health.

275.   All previous paragraphs are incorporated by reference.

276.   LRMP Standard # 1116 and WCP #1 require the USFS to manage land treatments to protect long-term stream health from damage from increased runoff.

277.   LRMP Standard #1301 and WCP #3 require that the only actions allowed in the WIZ are actions that maintain or improve long-term stream heath and ecosystem condition.

278.   LRMP Standard #1301 and WCP #3 do not allow any action that will cause long-term change to stream health class.

279.   LRMP Standard #1301 and WCP #3 require that any degraded system with and At-Risk or Diminished health classification progress towards robust.

280.   LRMP #1201 requires that the Forest Service conduct actions so that stream habitats are maintained or improved towards Robust.

281.   There are three streams in the area with a Diminished stream health rating and four with an At-Risk health rating.

282.   Each of these streams will be further degraded and will receive sediment during the project.

283.   Every single watershed in the project area is listed as moderate or highly sensitive to impacts due to large amounts of soils with sever erosion ratings.

284.   Sediment is a problem in the NWPA and increased sediment can cause a decrease in overall stream health.

285.   The USFS states that the impacts form logging will be short-term, but there is simply no evidence to support this conclusion.

286.   LRMP Standard #1106 and WCP #11 mandate that roads not introduce sediment into streams.

287.   Roads are generally the number one watershed concern in a project.

288.   Maintenance and temporary use of roads in within the WIZ has the

potential to increase sediment.

289.   There are currently 127.1 miles of roads with a density of 1.9 miles of roads per square mile in the Project area.

290.   The Forest Service violated NFMA because the Project fails to follow Forest Plan Standards protecting water quality and watershed health.

## REQUEST FOR RELIEF

Plaintiffs request that this Court award the following relief:

A. Declare that the Forest Service's interpretation of "game animals" is not in accord with the spirit and intent of the Norbeck Wildlife Preserve and violates the Norbeck Organic Act.

B. Declare that the Forest Service violated NEPA by tiering to or relying upon the Focus Species List without subjecting it to any NEPA analysis.

C. Declare that the Forest Service violated NEPA by failing to adequately address opposing viewpoints and offer accurate scientific analysis.

D. Declare that the Forest Service violated NEPA by failing to adequately address the cumulative impacts of livestock grazing and by failing to adequately consider an alternative that would eliminate livestock grazing from the Norbeck Wildlife Preserve.

E.   Declare that Forest Plan Standards that allow livestock grazing in the Norbeck Wildlife Preserve violate the Norbeck Organic Act because they do

not protect game animals, birds, and other wildlife.

F.  Declare that the Forest Service violated NFMA's mandate to consider the Best Available Science.

G.  Declare that the Forest Service violated the CWA by authorizing a project that degrades water quality in impaired streams.

H.  Declare that the Forest Service violated NEPA by authorizing a project that fails to take a 'hard look' and effectively assess the environmental impacts to water quality and stream health.

I.  Declare that the Forest Service violated NFMA by authorizing a project that fails to follow Forest Plan Standards protecting water quality and watershed health.

J.  Declare that for the above reasons the project is arbitrary and capricious and in violation of the APA.

K.  Declare that the Forest Service must withdraw the Project.

L.  Enjoin implementation of the Project.

M.  Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney fees; and

N.  Grant Plaintiffs such further relief as may be just, proper, and equitable.

RESPECTFULLY SUBMITTED this 3rd day of September, 2010.

/S/ John Meyer
John Meyer
Cottonwood Environmental Law Center
24 S. Wilson Ave. Suites 6-7
Bozeman, MT 59715
406.587.5800
406.587.5801 FAX
John@Cottonwoodlaw.org

/S/ K.E. Purcie Bennett
K.E. Purcie Bennett
Cottonwood Environmental Law Center
24 S. Wilson Ave. Suites 6-7
Bozeman, MT 59715
406.587.5800
406.587.5801 FAX
Purcie@cottonwoodlaw.org

Attorneys for Plaintiffs