UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| FRIENDS OF THE NORBECK and NATIVE ECOSYSTEMS COUNCIL, | ) ) ) | CIV. 10-5082-JLV |
| Plaintiffs, | ) ) | ORDER DISMISSING COMPLAINT |
| vs. | ) ) | |
| U.S. FOREST SERVICE and RICK CABLES, Regional Forester, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| STATE OF SOUTH DAKOTA and JEFFREY VONK, in his official capacity as Secretary of the South Dakota Department of Game, Fish and Parks, | ) ) ) ) ) ) | |
| Intervenors. | ) ) | |

## INTRODUCTION

This matter is before the court pursuant to a lawsuit filed by non-profit organizations Friends of the Norbeck and Native Ecosystems Council (collectively "plaintiffs") against the United States Forest Service and Rick Cables, Regional Forester (collectively "Forest Service"). (Docket 10). Plaintiffs' complaint is based on the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* The State of South Dakota and Secretary Jeffrey Vonk entered the case as intervenors with the court's approval. (Docket 28). The parties fully briefed the issues in this case, which are ripe for adjudication on the merits.

## FACTS AND PROCEDURAL HISTORY

The following recitation consists of facts undisputed by the parties as set forth in their pleadings and memoranda (Dockets 10, 12, 27, 36, 45, & 48), relevant case law, and the administrative record, particularly the Record of Decision and the Final Environmental Impact Statement.

In 1912, Peter Norbeck, a respected state senator, governor, and eventual United States Senator, established the Custer State Forest, now known as Custer State Park.  In 1920, Congress passed the Norbeck Organic Act ("NOA"), authorizing the President to create the Custer State Park Game Sanctuary by setting aside 30,000 acres of Harney National Forest, now known as the Black Hills National Forest, to adjoin the existing Custer State Forest (Custer State Park) "for the protection of game animals and birds and be recognized as a breeding place therefor."  16 U.S.C. § 675.  Over time, boundaries were adjusted and acreage added.  In 1949, Congress renamed the federal portion of the Custer State Park Game Sanctuary as the Norbeck Wildlife Preserve ("Preserve") to honor Peter Norbeck.  The Preserve lies adjacent to Custer State Park.

The Preserve "has been largely protected from extensive extractive uses (such as mining, logging, and grazing) and provides valuable wildlife habitat. Significantly, the Norbeck Preserve contains one of the few remaining old growth forests in the Black Hills."  Friends of the Norbeck v. U.S. Forest

2

Service, No. 10-cv-2164-AP, 2010 WL 4137500 at *1 (D. Colo. Oct. 18, 2010). "The diverse geography ranges in elevation from 4,500 to 7,242 feet, providing habitat to multiple game animals, such as elk, deer, and mountain goats; over fifty bird species, including species of nuthatch and woodpeckers, the northern goshawk, ruffed grouse and Merriam's turkey; brook trout and other fish species; and to various non-game animals." Sierra Club-Black Hills Group v. U.S. Forest Service, 259 F.3d 1281, 1284 (10th Cir. 2001).  The Forest Service manages the majority of the Preserve.  Id.  The Preserve consists predominately of public lands with some private land.  Id. at  n. 1.

In 1994 and 1995, the Forest Service approved two harvest projects and timber sales in the Needles and Grizzly areas of the Preserve.  Id.  The Forest Service approved the projects to enhance wildlife habitat in the Preserve in accordance with the National Forest Management Act ("NFMA").  Id.  Litigation over the projects ensued.  Id.  The Court of the Appeals for the Tenth Circuit found the projects improper and remanded the matter to the Forest Service. Id. at 1289.  The Tenth Circuit directed the Forest Service to prioritize the NOA over the NFMA in its planning process for the Preserve.  Id. at 1288-89; Friends of the Norbeck, 2010 WL 4137500 at *1.

In response to this litigation, Congress passed the 2002 Supplemental Appropriations Act for Further Recovery From and Response to Terrorist Attacks on the United States, part of which provided further direction to the

Forest Service in its management of the Preserve.  <u>Friends of the Norbeck</u>, 2010 WL 4137500 at *1.  Section 706 of the Act contained a rider that allowed the Needles and Grizzly projects to proceed, added 3,600 acres of the Preserve to the Black Elk Wilderness,[1] and required the Forest Service to consult with the South Dakota Department of Game, Fish and Parks in future management actions within the Preserve.  <u>Id.</u>  Congress authorized the Forest Service "to use the full spectrum of management tools including prescribed fire and silvicultural treatments to benefit game animal and bird habitat in meeting the purposes of the Norbeck Organic Act."  <u>Id.</u>

Pursuant to this congressional directive, on September 7, 2004, the Forest Service and the South Dakota Department of Game, Fish and Parks entered into a Memorandum of Understanding regarding the management and monitoring of the Preserve.  In 2006, participants in a Forest Service sponsored course completed a Norbeck Wildlife Preserve Landscape Assessment.  The participants spent two weeks in the Black Hills reviewing management information and interviewing various interest groups and stakeholders, including members of the public and federal, state, and local agencies.  The purpose of the assessment was to review forest and social conditions and draft recommendations for future planning and management activities within the Preserve.  The assessment recommended the agencies, in accordance with the

---

[1]The Black Elk Wilderness lies entirely within the Preserve and accounts for approximately half of the Project area.

2004 Memorandum of Understanding, (1) identify game animals and birds;[2] (2) design and evaluate habitat enhancement treatments in an integrated manner in the Preserve; and (3) engage interested stakeholders in the planning of management actions within the Preserve.  Upon completion of the assessment, an open house was held on October 23, 2006, in Custer, South Dakota, to share information about the Preserve with the public and to discuss possible management options for improving habitat for game animals and birds.

From the assessment, the Norbeck Wildlife Project ("Project") was born. The goal of the Project was to implement wildlife habitat improvements within the Preserve, including prescribed burning within the Black Elk Wilderness. The purpose of the Project was to benefit game animals and birds by improving habitat conditions in the Preserve and to protect those habitats from wildfire escaping from the Black Elk Wilderness.

On July 31, 2007, the Forest Service published in the Federal Register a Notice of Intent to prepare an Environmental Impact Statement ("EIS") for the Project.  The purpose of this notice was to encourage public input on the Project.  On August 1, 2007, the Forest Service sent a scoping document to

---

[2]Both agencies cooperated in the development of a list of game animals and birds on which to focus habitat objectives and to guide management in the Preserve.  This list became known as the Focus Species List.  Various members of the public were contacted during the development phase of the list. Approximately 25 individuals, groups, and agencies provided input on the proposed list.  In May of 2007, the agencies finalized the list and, in June of 2007, incorporated it into the Memorandum of Understanding.  In October of 2009, the agencies extended the Memorandum of Understanding for five years.

approximately 250 individuals, tribal representatives, interest groups, and other governmental entities.  The scoping document explained the purpose and need for the Project, provided maps of the Project, and solicited comments on the Project.  The Forest Service received 43 responses.

In May of 2008, the Forest Service completed a forest health evaluation of mountain pine beetle activity within the Preserve.  The study reported heavy mortality of ponderosa pine because of the pine beetle infestation.  The Forest Service modified the Project in part by proposing two additional action alternatives.

On May 14, 2009, the Rapid City Journal published an article discussing the Project and providing notice of a public meeting.  This meeting occurred on May 19, 2009, in Hill City, South Dakota, and was open to the public.[3]  On July 14, 2009, as a result of changes to the Project, the Forest Service published a revised Notice of Intent to prepare an EIS.

On November 27, 2009, the Forest Service published in the Federal Register a Notice of Availability ("NOA").  The NOA announced the availability of the draft EIS and initiated a 45-day comment period.  A legal notice of the opportunity to comment on the draft EIS was published in the Rapid City

---

[3]Since 2007, the Forest Service gave multiple presentations on the Project to the National Forest Advisory Board ("NFAB") and interest groups such as the Norbeck Society and the Black Hills Sportsmen Club.  The NFAB conducted a field review of the area on August 19, 2009.  All NFAB meetings were advertised in the Federal Register and open to the public.

Journal on November 27, 2009.  On December 2, 2009, seven members of the public and two employees of the South Dakota Department of Game, Fish and Parks went on a public field trip to the Project area.  A total of 49 comment letters on the draft EIS were received during the comment period.  The Forest Service determined none of the comments generated a need for re-analysis or required major substantive changes to the draft EIS.

In March of 2010, the Forest Service issued a final EIS disclosing the direct, indirect, and cumulative environmental impacts of the Project.  The final EIS identified five significant issues, including effects on wilderness values, effects on wildlife and wildlife habitat, effects on large trees, effects of the mountain pine beetle on wildlife habitat, and the potential for escaped fire.  The final EIS considered four alternatives, including a "no action" alternative.

On March 27, 2010, the district ranger for the Hell Canyon Ranger District, Black Hills National Forest, signed the Record of Decision authorizing the Project and selecting alternative four.  Alternative four originally called for the implementation of mechanical treatments on about 5,190 acres within the Preserve and 7,502 acres of prescribed burning, including up to 5,291 acres of burning within the Black Elk Wilderness.  However, the Record of Decision modified alternative four in that work would take place only outside the Black Elk Wilderness.  Project operations were limited to between August 1 through February 28 to address habitat issues such as spring calving and nesting.  The

Record of Decision also eliminated 246 acres of mechanical treatment originally proposed in alternative four.

Plaintiffs filed separate administrative appeals.  The deputy forest supervisor for the Black Hills National Forest reviewed both appeals and recommended their denial.  On July 14, 2010, the appeal deciding officer denied plaintiffs' appeals and affirmed the district ranger's decision approving the Project and its implementation.

Having exhausted their administrative remedies, plaintiffs jointly filed this lawsuit on September 3, 2010, in the United States District Court for the District of Colorado.  (Docket 1).  Plaintiffs sought federal judicial review under the APA.  Id.  Plaintiffs sought to overturn the Forest Service's decision approving the Project and its implementation, arguing the decision violated numerous environmental protection acts, namely, the NOA, 16 U.S.C. § 675, the NFMA, 16 U.S.C. §§ 1600-1614, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f.  Id.

On October 1, 2010, and again on October 6, 2010, plaintiffs amended their complaint.  (Dockets 6 & 10).  On October 7, 2010, plaintiffs filed a motion for preliminary injunction pursuant to Fed. R. Civ. P. 65, seeking to enjoin the Forest Service from implementing the Project.  (Docket 12).

On October 12, 2010, the State of South Dakota and Jeffrey Vonk, in his official capacity as the Secretary of the Department of Game, Fish and Parks

8

(collectively "intervenors"), moved to intervene in the case. (Docket 15). The court granted the motion. (Docket 28). The Forest Service and intervenors denied plaintiffs' claims and opposed plaintiffs' motion for preliminary injunction. (Dockets 27, 36, 45, 46, & 48).

On October 18, 2010, upon motion of the Forest Service, the Colorado district court transferred the case to this court. (Docket 19). On December 9, 2010, the court held a hearing on plaintiffs' motion for preliminary injunction. On December 10, 2010, the court denied plaintiffs' motion. (Docket 69).

## DISCUSSION

Having determined injunctive relief cannot lie, the court turns to the merits of plaintiffs' challenges as set forth in their amended complaint. (Docket 10). After careful consideration of the administrative record in this case,[4] the court finds plaintiffs cannot prevail on their claims and their complaint must be dismissed.

## A.    Standard of Review under the APA

As plaintiffs brought suit under the APA, that Act establishes the court's scope of review. The APA permits judicial review of agency actions. Sierra

---

[4]Absent extraordinary circumstances, review of agency action under the APA is confined to the administrative record that was before the agency when it made the decision being challenged. Newton County Wildlife Ass'n v. Rogers, 141 F.3d 803, 808 (8th Cir. 1998). "Th[e] court's task is to make sure the [agency] considered the information available at the time it made its decision; if the agency's decision was proper at the time it was made, our inquiry is at an end." Id. The administrative record in this case is voluminous.

<u>Club v. Kimbell</u>, 623 F.3d 549, 558-59 (8th Cir. 2010).  "Under the APA, a reviewing court will not set aside agency action unless it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " <u>Id.</u> at 559 (quoting 5 U.S.C. § 706(2)(A)).  A decision is arbitrary and capricious if:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

<u>Central South Dakota Coop. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.</u>, 266 F.3d 889, 894 (8th Cir. 2001) (citation omitted).

If an agency's decision is deficient, a reviewing court should not cure such deficiencies by supplying a reason for the agency's decision that the agency itself has not provided.  <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.</u>, 463 U.S. 29, 42 (1983).  The burden is on the party bringing a claim under the APA to demonstrate the agency's actions were arbitrary and capricious.  <u>National Wildlife Federation v. Harvey</u>, 574 F. Supp. 2d 934, 947 (E.D. Ark. 2008).

**B.    Plaintiffs' NOA Claims**

Plaintiffs argue the Forest Service's decision approving the Project and its implementation violated the NOA because the Project will harm elk habitat, including thermal cover and breeding habitat, and will harm bird habitat,

especially mature and late successional tree stands.  The court finds plaintiffs'
claims unavailing.

The NOA designated the Preserve as a breeding place and area for the
protection of game animals and birds.  16 U.S.C. § 675.[5]  The NOA governs the
management of the Preserve, and management plans must comply with its
specific mandate.  Sierra Club-Black Hills Group, 259 F.3d at 1287 (holding
that, although the NFMA generally applies to the National Forest System,
courts cannot apply the NFMA in such a way as to run counter to the NOA
when dealing with the Preserve).  "The Forest Service can continue to establish
management plans under both the Norbeck Act and the NFMA, but the NFMA
mandate must be supplemental and may not diminish (through balancing) the
more specific mandate of the Norbeck Act."  Id. at 1288-89.

Under the NOA, timber sales and timber harvests are permitted in
limited situations.  Id. (citing 16 U.S.C. § 678a).[6]  Further, as stated previously,

---

[5]This section reads as follows:

> There is designated as the Norbeck Wildlife Preserve such areas, not
> exceeding forty-six thousand acres, of the Harney National Forest,
> and adjoining or in the vicinity of the Custer State Park, in the State
> of South Dakota, as should, in the opinion of the President of the
> United States, be set aside for the protection of game animals and
> birds, and be recognized as a breeding place therefor.

16 U.S.C. § 675.

[6]Section 678a provides in relevant part:

> That the cutting and removal of timber, except where clearing is
> necessary in connection with mining operations or to provide space
> for buildings or structures used in connection with mining
> operations, shall be conducted in accordance with the marking rules

the Forest Service may "use the full spectrum of management tools including prescribed fire and silvicultural treatments to benefit game animal and bird habitat in meeting the purposes of the Norbeck Organic Act." <u>Friends of the Norbeck</u>, 2010 WL 4137500 at *1 (citation and internal quotation marks omitted).

The court finds the Forest Service's decision approving the Project and its implementation was not arbitrary, capricious, or contrary to the NOA. The Project is designed in part to improve habitat for elk and birds, and the Forest Service properly considered the effects of the Project on those species. Plaintiffs argue the Project will not have the desired effect of improving elk and bird habitat, but the court must defer to the informed discretion of the Forest Service. <u>Central South Dakota Coop. Grazing Dist.</u>, 266 F.3d at 894-95 ("When the resolution of the dispute involves primarily issues of fact and analysis of the relevant information requires a high level of technical expertise, [courts] must defer to the informed discretion of the responsible federal agencies.") (citation and quotation marks omitted).

---

and timber sale practices applicable to the Harney National Forest, and no use of the surface of the claim or the resources therefrom not reasonably required for carrying on mining and prospecting shall be allowed except under the national-forest rules and regulations . . . .

16 U.S.C. § 678a.

**C.     Plaintiffs' NEPA Claims**

Plaintiffs argue the Forest Service's decision approving the Project and its implementation violated NEPA[7] in several respects.  Plaintiffs allege the Forest Service failed to adequately consider the cumulative impacts of grazing and the reduction of thermal cover, failed to take a hard look at the environmental impacts on game animals and birds, failed to take a hard look at the environmental impacts of sediment on water quality, failed to subject the Focus Species List to any NEPA analysis, and improperly tiered the FEIS to the Focus Species List.  The court rejects plaintiffs' arguments.

The goal of NEPA is two-fold:

First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process.

Baltimore Gas & Elec. Co. v. Natural Resources Defense Counsel, Inc., 462 U.S. 87, 97 (1983) (citations and internal quotation marks omitted).

NEPA does not establish substantive rules about how national forests should be managed, but rather sets procedural rules for government agencies. Sierra Club v. Kimbell, 595 F. Supp. 2d 1021, 1026 (D. Minn. 2009), *aff'd* 623 F.3d 549 (8th Cir. 2010) (citing Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc., 435 U.S. 519, 558 (1978)).  NEPA requires that federal

_____

[7]NEPA does not create a private right of action; however, the APA permits judicial review of agency actions within the context of NEPA.  Sierra Club, 623 F.3d at 558-59.

agencies prepare an EIS for all " 'major Federal actions significantly affecting the quality of the human environment.' " Newton County Wildlife Ass'n, 141 F.3d at 809 (quoting 42 U.S.C. § 4332(2)(C)).  The EIS is a detailed statement on the environmental impact of the proposed action, any unavoidable adverse environmental effects of the proposed action, and any alternatives to the proposed action.  Sierra Club, 595 F. Supp. 2d at 1026 (citing 42 U.S.C. § 4332(2)(C)).  This requires study of the direct, indirect, and cumulative impacts of the proposed action.[8]  Arkansas Wildlife Federation v. U.S. Army Corps of Engineers, 431 F.3d 1096, 1101 (8th Cir. 2005) (citing 40 C.F.R. § 1508.25).[9]  An EIS "must not merely catalog environmental facts, but also

---

[8]Direct impacts are those caused by the action that occur at the same time and place.  40 C.F.R. § 1508.8(a).  Indirect impacts are those effects caused by the action that are reasonably foreseeable, but later in time or farther removed in distance.  40 C.F.R. § 1508.8(b).  A cumulative impact is defined as follows:

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7.  A "but for" causal relationship is not enough to make an agency responsible for a particular effect under NEPA.  Sierra Club v. Clinton, 689 F. Supp. 2d 1147, 1160 (citing U.S. Dep't of Transp. v. Public Citizen, 541 U.S. 752, 767 (2004)).  NEPA requires "a reasonably close causal relationship" between the effect and the alleged cause.  Id.  The key question is whether the agency's consideration of the indirect and cumulative impacts of the proposed action was arbitrary or capricious.  Id.

[9]The Council on Environmental Quality has promulgated regulations implementing NEPA that may be found primarily at 40 C.F.R. §§ 1500.1-1518.4 and 36 C.F.R. §§ 215-220.  Sierra Club, 595 F. Supp. 2d at 1026.

explain fully its course of inquiry, analysis and reasoning." <u>Friends of the Boundary Waters Wilderness v. Dombeck</u>, 164 F.3d 1115, 1129-30 (8th Cir. 1999) (citation and internal quotation marks omitted).

The requirement of an EIS ensures information about the proposed action's environmental impact will be considered by the agency and made available to the public. <u>Sierra Club</u>, 595 F. Supp. 2d at 1026. "NEPA does not prevent agencies from taking environmentally harmful action: 'If the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs. . . . NEPA merely prohibits uninformed–rather than unwise–agency action.'" <u>Id.</u> (quoting <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 349 (1989)).

In enacting NEPA, Congress did not require agencies "to elevate environmental concerns over other appropriate considerations." <u>Baltimore Gas & Electric Co.</u>, 462 U.S. at 97. Rather, NEPA requires only that an agency take a "hard look" at the environmental consequences before taking major action. <u>Id.</u>

Here, the court's limited scope of review under the APA is crucial to its analysis. "The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that the decision is not arbitrary or capricious." <u>Id.</u> at 97-98. Adequate agency consideration is evidenced through the EIS's form, content, and

preparation.  <u>Friends of the Boundary Waters Wilderness</u>, 164 F.3d at 1128.  A reviewing court need not reject an EIS for inconsequential or technical deficiencies.  <u>Id.</u>  Rather, a reviewing court should consider "whether the agency's actual balance of costs and benefits was arbitrary or clearly gave insufficient weight to environmental values."  <u>Id.</u> (citation and internal quotation marks omitted).

A reviewing court may not second-guess the values assigned by the agency to environmental impacts–NEPA does not require courts to determine the merits of conflicting scientific views.  <u>Friends of the Boundary Waters Wilderness</u>, 164 F.3d at 1130.  It is not the role of the court to choose between differing views of experts, and the court should defer to the agency's reasoned analysis.  <u>Id.</u>  NEPA does not require the court to decide whether an EIS is based on the best scientific methodology available or to resolve disagreements among scientists as to methodology.  <u>Id.</u>  The function of the court is to "ensure that the procedure followed by the agency resulted in a reasoned analysis of the evidence before it, and that the agency made the evidence available to all concerned."  <u>Id.</u>

With respect to the methodology used by the agency, if the administrative record contains evidence that supports the positions of both the agency and plaintiffs, the agency is entitled to rely on its experts' tests and observations, and decisions made in such reliance are not arbitrary and capricious.  <u>Central South Dakota Coop. Grazing Dist.</u>, 266 F.3d at 899.  Even if the agency's data is flawed, if the agency has relied on a number of findings and only some are

16

erroneous, a reviewing court may reverse an agency decision only if "there is a significant chance that but for the errors the agency might have reached a different result." Id. (citation and internal question marks omitted).  The question for a reviewing court "is not whether there might have been a better way for the agency to resolve the conflicting issues with which it was faced, but whether the agency's choice is a reasonable one." Id. (citation and internal quotation marks omitted); see also Friends of the Boundary Waters Wilderness, 164 F.3d at 1130 (On matters within an agency's expertise, reviewing courts must "defer to the agency's choice of methodology as long as it is not arbitrary or without foundation.").

Finally, a reviewing court is not free to substitute its judgment for that of the agency, rather the court's role "is to ensure that the agency has adequately considered and disclosed the environmental impacts of its actions." In re Operation of Missouri River System Litigation, 516 F.3d 688, 693 (8th Cir. 2008) (citation and internal quotation marks omitted); see also Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43 ("[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.  In reviewing that explanation, we must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.") (internal quotation marks and citation omitted).

The court finds the Forest Service took the requisite "hard look" at the environmental impacts of the Project on game animals, birds, and water

17

quality.  The court further finds the Forest Service adequately evaluated and disclosed the cumulative effects of grazing and reduced thermal cover.  The Forest Service relied on its science and methodology to form conclusions and a plan of action.  Plaintiffs disagree with those conclusions, but it is not the role of the court to resolve challenges to the Forest Service's methodology and scientific approach.  All NEPA requires is that the Forest Service conduct a reasoned analysis of the evidence before it, disclose the environmental impact of its actions, and reach a decision that is not arbitrary or capricious.  The Forest Service complied with the mandates of NEPA.

Plaintiffs' final allegations center around the Focus Species List. Plaintiffs argue the Forest Service was required to subject the Focus Species List to NEPA analysis and could not tier the FEIS to the Focus Species List without NEPA analysis.  The court finds plaintiffs failed to exhaust these claims during administrative proceedings and, therefore, are barred from raising them now.  Vt. Yankee Nuclear Power Corp., 435 U.S. at 553 (Parties challenging an agency action under NEPA must "structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position and contentions."); Central South Dakota Coop. Grazing Dist., 266 F.3d at 901 (declining to address an argument plaintiff failed to raise before the agency during administrative proceedings).  Plaintiffs argue they raised on appeal the issues concerning the Focus Species List by: (1) informing the Forest Service it "fail[ed] to address the protection and breeding place needs of any species, or to focus on species needing sanctuary from the industrial forestry activities on the

millions of acres of surrounding Black Hills National Forest[]"; and (2) informing the Forest Service "[t]he Focus Species List is also heavily weighted towards 'weedy species.' . . . Predators that are known to be secretive and adverse to human disturbance (e.g., mountain lion) were dismissed as management indicator species for the preserve.  The list needs to be reformulated."  (Docket 57 at pp. 42-43).  The court finds these concerns raised by plaintiffs during the administrative process insufficient to put the Forest Service on notice of plaintiffs' position that the Focus Species List required NEPA analysis and could not be tiered to the FEIS.

Even if the court considers plaintiffs' claims on the merits, the claims fail.  The court reviews the Forest Service's threshold decision as to NEPA's applicability under a reasonableness standard, rather than an arbitrary and capricious standard.  Goos v. I.C.C., 911 F.2d 1283, 1291-92 (8th Cir. 1990).  NEPA requires that federal agencies prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment.' " Newton County Wildlife Ass'n, 141 F.3d at 809 (quoting 42 U.S.C. § 4332(2)(C)).  Plaintiffs argue the creation of the Focus Species List was a major federal action requiring NEPA analysis, citing primarily to Sierra Forest Legacy v. U.S. Forest Service, 652 F. Supp. 2d 1065 (N.D. Cal. 2009), Kern v. U.S. Bureau of Land Management, 284 F.3d 1062 (9th Cir. 2002), and Northcoast Environmental Center v. Glickman, 136 F.3d 660 (9th Cir. 1998).  The court finds these cases to be inapposite.  Sierra Forest Legacy involved an amendment to the management indicator species monitoring system; Kern and

19

Northcoast Environmental Center involved management guidelines that
described strategies to minimize the spread of fungus.  The Focus Species List
does not rise to the level of a management indicator species monitoring system
and is not a set of guidelines or strategies for future projects.  Rather, the
Focus Species List is an informational tool to assist the Forest Service in
furthering habitat goals in the Preserve.  The court finds the Forest Service
acted reasonably in deciding the Focus Species List was not the type of major
federal action requiring NEPA analysis.

Finally, the court finds the Forest Service did not improperly tier the
FEIS to the Focus Species List.  An agency may not "tier[] to a document that
has not itself been subject to NEPA review."[10]  Kern, 284 F.3d at 1073.  The

---

[10]The Council on Environmental Quality defines tiering as follows:

Tiering refers to the coverage of general matters in broader
environmental impact statements (such as national program or policy
statements) with subsequent narrower statements or environmental
analyses (such as regional or basinwide program statements or
ultimately site-specific statements) incorporating by reference the
general discussions and concentrating solely on the issues specific to
the statement subsequently prepared.  Tiering is appropriate when
the sequence of statements or analyses is:

(a)     From a program, plan, or policy environmental impact
        statement to a program, plan, or policy statement or analysis
        of lesser scope or to a site-specific statement or analysis.

(b)     From an environmental impact statement on a specific action
        at an early stage (such as need and site selection) to a
        supplement (which is preferred) or a subsequent statement or
        analysis at a later stage (such as environmental mitigation).
        Tiering in such cases is appropriate when it helps the lead
        agency to focus on the issues which are ripe for decision and

20

Focus Species List is not the type of document appropriate for tiering.  Rather, the court believes the FEIS incorporated by reference the Focus Species List, which is allowable pursuant to 40 C.F.R. § 1502.21.[11]

------

> exclude from consideration issues already decided or not yet ripe.

40 C.F.R. § 1508.28.

The Council on Environmental Quality provides further direction on the use of tiering:

> Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28).  Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action.  The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions.

40 C.F.R. § 1502.20.

[11]This regulation states as follows:

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.  The incorporated material shall be cited in the statement and its content briefly described.  No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

21

**D.      Plaintiffs' NFMA Claims**[12]

Plaintiffs argue the Forest Service's decision approving the Project and its implementation violated the NFMA by failing to follow the best available science and forest plan standards aimed to protect water quality and watershed health. The court finds plaintiffs' arguments unavailing.

The NFMA provides for a two-phase forest planning process:

First, the Forest Service is to develop a Land and Resource Management Plan (forest plan), which is a "general planning tool" that "provides guidelines and approved methods by which forest management decisions are to be made." Forest plans are to be prepared in accordance with NEPA. Second, the Forest Service implements the forest plan through site-specific actions, assessing each such action to determine its compatibility with the forest plan, NEPA, and other applicable law. If the proposed action was not adequately analyzed in an Environmental Impact Statement (or EIS) for the forest plan, as required by NEPA, a project-level EIS must be completed, unless the agency has determined through its Environmental Assessment (or EA) that the project will not significantly affect the environment (finding of no significant impact, or FONSI), in which case the EA itself may suffice.

Central South Dakota Co-op. Grazing Dist., 266 F.3d at 892-93 (internal citations omitted).

_____

40 C.F.R. § 1502.21.  The public had access to the Focus Species List through the website of the Black Hills National Forest.

     [12]Unlike NEPA, the NFMA provides the mechanism for obtaining judicial review.  Newton County Wildlife Ass'n, 141 F.3d at 807.  However, the scope of review (the arbitrary and capricious standard) is still governed by the APA.  Id.

### 1.     Phase One

The NFMA directs the Secretary of Agriculture to " 'develop, maintain, and, as appropriate, revise land and resource management plans [LRMPs] for units of the National Forest System.' " Sierra Club v. Robertson, 28 F.3d 753, 754 (8th Cir. 1994) (quoting 16 U.S.C. § 1604(a)).  A LRMP establishes the overall management direction for the forest unit for ten to fifteen years.  Id.  A LRMP is a "programmatic statement of intent that establishes basic guidelines and sets forth the planning elements that will be employed by the Forest Service in future site-specific decisions."  Id.  When preparing a LRMP, the Forest Service must comply with various statutes and regulations including the Multiple-Use-Sustained-Yield Act, 16 U.S.C. §§ 528-531, which requires national forests " 'be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes.' " Id. (quoting 16 U.S.C. § 528).  The Forest Service must also comply with NEPA when preparing a LRMP.  Id.  Accordingly, a LRMP must be accompanied by a draft and final EIS.  Id.

A team under the command of the Forest Supervisor develops a proposed LRMP along with a draft and final EIS.  Id.  To satisfy NEPA, plan drafters formulate and evaluate alternative management scenarios with the goal of "identifying the alternative that comes nearest to maximizing net public benefits."  Id.  The Regional Forester reviews the proposal and either approves or disapproves it.  Id.  An approved plan and final EIS are supplemented by the Regional Forester's record of decision.  Id.

### 2.      Phase Two

In phase two, individual site-specific projects are proposed and assessed using the LRMP.  Id.  The Forest Service must ensure all projects are consistent with the plan.  Id.  Additional NEPA analysis is conducted to determine the effects of the specific project and to consider alternative actions.  Id.  Before the Forest Service can permit logging, the NFMA requires it to: (1) propose a specific site in which logging will take place and the harvesting methods to be used, (2) ensure that the project is consistent with the LRMP, (3) provide affected parties with notice and an opportunity to be heard, (4) conduct an environmental analysis of the project under NEPA, and (5) make a final decision to permit logging.  Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 729-30 (1998).

The NFMA regulations require the Forest Service to consider the "best available science."  36 C.F.R. § 219.35.  Courts grant considerable deference to agencies on matters requiring a high level of technical expertise, including what is the best available science for purposes of the NFMA.  Ecology Center v. Castaneda, 574 F.3d 652, 658-59 (9th Cir. 2009).

Given the deference afforded to the Forest Service, the court finds the Forest Service considered the best available science in developing the Project. Plaintiffs argue the Forest Service failed to consider their scientific studies, however, it is not the court's role to weigh competing scientific analyses.  Id.

24

Further, the court finds the Project is consistent with the standards of the forest plan.

**CONCLUSION**

After a thorough review of the administrative record in this case, the court concludes the Forest Service's decision approving the Project and its implementation was not arbitrary, capricious, or contrary to the NOA, NEPA, or NFMA.  The court is bound by the limited scope of review permitted by the APA.  Under such review, relief for plaintiffs cannot lie.  Accordingly, it is hereby

ORDERED that plaintiffs' amended complaint (Docket 10) is dismissed.

Dated January 28, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE